IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| In the Matter of R.B.F.S., A.M.F.S., R.E.F.S., and O.J.F.S., minor children. | ) ) ) | OPINION |
| _____ | ) | Case No. 20080231-CA |
| | ) | |
| B.J.M. and A.F.M., | ) | |
| | ) | F I L E D |
| Petitioners and Appellees, | ) | (May 3, 2012) |
| | ) | |
| v. | ) | 2012 UT App 132 |
| | ) | |
| B.S., | ) | |
| | ) | |
| Respondent and Appellant. | ) | |

-----

Third District, Salt Lake Department, 073900653
The Honorable Robert K. Hilder

Attorneys:    Joshua F. King, Kaysville, for Appellant
              Randy S. Ludlow, David J. Hardy, and Larry S. Jenkins, Salt Lake City,
              for Appellees

-----

Before Judges McHugh, Davis, and Thorne.

McHUGH, Presiding Judge:

¶1    This case is before us on remand from the Utah Supreme Court with instructions to address any remaining issues. *See In re adoption of R.B.F.S. (R.B.F.S. II)*, 2011 UT 46, ¶ 22, 258 P.3d 583. We decide those issues now and affirm the trial court's decision enforcing B.S.'s (Father) voluntary relinquishment of his parental rights.

BACKGROUND

¶2     The background to this case is provided in-depth in our prior opinion, *In re R.B.F.S.* (*R.B.F.S. I*), 2009 UT App 223, 218 P.3d 908, and in the supreme court's opinion, *R.B.F.S. II*, 2011 UT 46.  Accordingly, we do not restate the facts in detail here.

¶3     Father and A.F.M. (Mother) are the parents of four minor children (the Children).  The parents divorced in August 2005.  One month later, Father executed a relinquishment of his parental rights (the Relinquishment) in the presence of a notary public.  As part of the Relinquishment, Father "waive[d] any and all rights [he] ha[d] in relation to the children."  He also consented to the adoption of the Children at some future time and to the permanent termination of his parental rights.  On the same date, the parties entered into a stipulation (the Stipulation) to modify their divorce decree, which incorporated the Relinquishment by reference.  As part of the Stipulation, Father consented to the adoption of the Children by Mother's future spouse, even though a spouse had not yet been identified.  Nonetheless, Father agreed to continue paying child support and medical expenses until the future adoption by Mother's yet-to-be-identified husband was finalized.

¶4     In October 2005, Mother filed the Stipulation, incorporating the Relinquishment, with the trial court.  Judge Sandra N. Peuler rejected it on two grounds:  first, because "a relinquishment of parental rights" in the trial court is enforceable only in conjunction with an adoption petition, and, second, because no stepfather had resided with the Children for at least one year as required to finalize an adoption under Utah Code section 78B-6-135(7)(b).  After Judge Peuler declined to enforce the Stipulation, it is undisputed that Father had substantial involvement with the Children and continued to exercise visitation until his rights were eventually terminated.

¶5     On April 30, 2007, Mother and her new husband (Stepfather) filed a petition to determine parental rights and a proposed order to terminate Father's parental rights based on the Relinquishment.  Stepfather filed a separate adoption petition on the same day.  Because Judge Peuler was not available at the time, Judge Robert K. Hilder signed the order terminating Father's parental rights based on the Relinquishment.  Mother and Stepfather did not notify Father of these proceedings, and he therefore did not have an opportunity to be heard before Judge Hilder executed the order.
¶6     When Father subsequently learned that the trial court had enforced the Relinquishment, he wrote a letter to Judge Hilder objecting to the decision.  Judge

Hilder treated Father's letter as a motion to reconsider and notified Father, Mother, and Stepfather of his intent to entertain further argument on the matter. After extensive briefing and argument, Judge Hilder denied the motion to reconsider. On appeal, this court reversed the trial court's ruling on the ground that the petition to terminate Father's parental rights was not filed with a facially valid adoption petition as required by Utah Code section 78B-6-112, and we therefore remanded the case to the trial court. *See R.B.F.S. I*, 2009 UT App 223, ¶ 12; *see also* Utah Code Ann. § 78B-6-112 (2008) (permitting an adoption petition to be filed separately in the trial court, so long as the termination is "for the purpose of facilitating the adoption of the children"). In particular, we determined that the trial court would have subject matter jurisdiction to terminate Father's parental rights only if there was good cause to grant the adoption, despite the fact that Stepfather had not resided with the Children for a year. *See R.B.F.S. I*, 2009 UT App 223, ¶¶ 10-12 (citing Utah Code Ann. § 78B-6-135(7)(b) (allowing a stepparent to adopt before residing with the children for a year upon a showing of good cause)). Therefore, we remanded the matter to the trial court to resolve the factual issues related to that court's subject matter jurisdiction.

¶7 Mother appealed and the supreme court reversed our decision, holding that the requirements of section 78B-6-135(7)(b) are not jurisdictional and, therefore, need not be satisfied before the termination of the biological father's parental rights. *See R.B.F.S. II*, 2011 UT 46, ¶ 22, 258 P.3d 583. As instructed by the supreme court, we now address the remaining issues that Father raised in his initial appeal. *See id.*

ISSUES AND STANDARDS OF REVIEW

¶8 First, Father contends that Judge Hilder's ruling terminating his parental rights improperly overruled the decision of Judge Peuler in violation of the law of the case doctrine. Our review of this issue is composed of two parts: Initially, we determine whether the trial judge abused his discretion in revisiting a matter previously decided by another judge. *See In re E.H.*, 2006 UT 36, ¶ 32, 137 P.3d 809. We then review the substance of the second judge's decision, which in this case is an issue of law that we review for correctness. *See id.*

¶9 Second, Father claims that the trial court erroneously precluded him from testifying regarding the Children's best interests because he has inchoate rights that survived the relinquishment of his parental rights. Questions of standing are primarily

questions of law that we review for correctness. *See Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 14, 216 P.3d 944. However, we do not give advisory opinions; an issue must be ripe before we will consider it on appeal. *See Carter v. Lehi City*, 2012 UT 2, ¶ 93, 269 P.3d 141.

¶10   Third, Father contends that the trial court erred by looking solely to the plain language of Utah Code section 78B-6-126 in determining that the statute applied to both married fathers and unmarried fathers. Father also contends that the trial court erred in concluding that a "best interests of the child" analysis was not required under the Utah Adoption Act (the Adoption Act) before his parental rights could be terminated. *See* Utah Code Ann. §§ 78B-6-101 to -145 (2008) (current version at *id.* (2008); *id.* (Supp. 2011)).[1] Issues of "statutory interpretation are questions of law that we review for correctness." *See In re adoption of B.W.G.*, 2007 UT App 278, ¶ 4, 167 P.3d 1099.

¶11   Finally, Father contends that enforcement of the Relinquishment was barred by the doctrines of equitable estoppel, quasi-estoppel, waiver, and laches. These equitable claims present mixed questions of fact and law. *See Richards v. Brown*, 2009 UT App 315, ¶ 11, 222 P.3d 69, *aff'd*, 2012 UT 14, 704 Utah Adv. Rep. 39. We review the trial court's factual findings under a clear error standard "but review its legal conclusions for correctness."[2] *Id.*

---

[1]The trial court cited Utah Code section 78-30-4.12, which was repealed and reincorporated, in substantially the same form, as section 78B-6-102(6). *Compare* Utah Code Ann. § 78-30-4.12(3) (Supp. 2007), *with id.* § 78B-6-102(6) (2008). Because of subsequent amendments to the Adoption Act, we cite to the 2008 version of the Utah Code Annotated unless otherwise noted.

[2]Father also argues that the trial court violated his due process rights by terminating his parental rights without notice and a hearing. However, he provides no authority or analysis in support and fails to explain how Judge Hilder's treatment of his letter as a motion to reconsider did not provide a sufficient opportunity to be heard. Therefore, we do not consider this issue. *See Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904 (holding that when an argument is inadequately briefed we may decline to address it); *see also* Utah R. App. P. 24(a)(9) (discussing the
(continued...)

ANALYSIS

## I. Law of the Case

¶12 Father contends that the law of the case doctrine prohibited Judge Hilder from terminating his parental rights because Judge Peuler had already ruled on the validity of the Relinquishment by declining to enforce the Stipulation. However, the Utah Supreme Court has held that the "[l]aw of the case does not prohibit a district court judge from revisiting a previously decided issue during the course of a case, regardless of whether the judge has changed or remained the same throughout the proceedings." *See Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 11, 216 P.3d 352. This is true even when a second judge has taken over the case because "the two judges, while different persons, constitute a single judicial office." *PC Crane Serv., LLC v. McQueen Masonry, Inc.*, 2012 UT App 61, ¶ 43, 273 P.3d 396 (internal quotation marks omitted). Instead, "'the doctrine *allows* a court to decline to revisit issues within the same case once the court has ruled on them.'" *Mid-America Pipeline Co.*, 2009 UT 43, ¶ 11 (quoting *IHC Health Servs., Inc. v. D&K Mgmt.*, 2008 UT 73, ¶ 26, 196 P.3d 588). This rule

> tracks with the Utah Rules of Civil Procedure, which provide that prior to final judgment, "any order or other form of decision, however designated, that adjudicates fewer than all the claims . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

*Id.* ¶ 12 (omission in original) (quoting Utah R. Civ. P. 54(b)). Accordingly, Judge Hilder was free to revisit the validity of the Relinquishment and Stipulation even though both were previously decided by Judge Peuler.

## II. Father's Right to Testify as to the Children's Best Interests

---

[2](...continued)
requirements of the argument section).

¶13 Father next argues that he retained inchoate rights in the Children that would allow him to testify as to their best interests at the adoption proceeding. *See* Utah Code Ann. § 78B-6-137 (requiring that prior to the final decree of adoption the trial court must be "satisfied that the interests of the child will be promoted by the adoption"); Utah R. Civ. P. 24(a) (providing that a party may intervene as of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties"). However, the record before us does not indicate that any adoption proceeding has yet occurred or that Father has moved to intervene in any proceeding. Consequently, Father's argument that he was denied an opportunity to testify concerning the Children's best interests at such a proceeding is not yet ripe and we do not consider it further. *See Board of Trs. v. Keystone Conversions, LLC*, 2004 UT 84, ¶ 32, 103 P.3d 686 (requiring an issue to be ripe before it may be considered on appeal).

## III. Statutory Interpretation

¶14 Father contends that the trial court "erred in not looking beyond the plain language of [Utah Code section 78B-6-126 (the Relinquishment Statute)] . . . to legislative history and public policy to ascertain the statute[']s intent." The essence of Father's argument is that the statute was intended to apply only to biological fathers who have no relationship with their children. Because he was married to Mother at the time of the Children's births or adoptions[3] and had been continuously involved with them until the trial court enforced the Relinquishment in April 2007, Father asserts that the Relinquishment Statute is inapplicable. In support of this argument, however, Father provides no citation to legislative history, relies solely on superseded case law to advance a vague public policy argument,[4] and fails to articulate how the

---

[3]Father and Mother adopted three of their four children during their marriage.

[4]Father relies on *Taylor v. Waddoups*, 121 Utah 279, 241 P.2d 157 (1952), apparently arguing that the Relinquishment should be set aside as against public policy because it was signed before a notary public and not before a judge. *See id.* at 160. However, the statute in *Taylor* is no longer in effect and the relevant statute expressly provides that a

(continued...)

Relinquishment Statute is ambiguous. Although Father's argument is inadequately briefed, we exercise our discretion to review the trial court's decision on this issue. *See Golden Meadows Props., LC v. Strand*, 2011 UT App 76, ¶ 1 n.1, 249 P.3d 596 (exercising discretion to consider the merits of an inadequately briefed argument), *cert. denied*, 263 P.3d 390 (Utah 2011); *see also State v. Gamblin*, 2000 UT 44, ¶ 8, 1 P.3d 1108 ("[W]e are not obligated to strike or disregard a marginal or inadequate brief, and in this case we choose to further address defendant's arguments in the interests of justice.").

## A. The Relinquishment Statute Plainly Applies to Married Fathers

¶15    Principles of statutory interpretation require us to "look[] first to the plain language" with the "primary objective" of giving effect to the legislature's intent. *Savage v. Utah Youth Vill.*, 2004 UT 102, ¶ 18, 104 P.3d 1242 (internal quotation marks omitted). If that language is clear, our inquiry is complete:

> [I]t is elementary that we do not seek guidance from legislative history and relevant policy considerations when the statute is clear and unambiguous. Rather, "[w]e must be guided by the law as it is . . . . When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction."

*C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 13, 977 P.2d 479 (omission and second alteration in original) (emphasis and citation omitted) (quoting *Salt Lake Child & Family Therapy Clinic v. Frederick*, 890 P.2d 1017, 1020 (Utah 1995)) (additional internal quotation marks omitted).

¶16    The Relinquishment Statute contained in the Adoption Act mandates that "[a] consent or relinquishment is effective when it is signed and may not be revoked." Utah

---

[4](...continued)
relinquishment may be signed before a notary public. *See* Utah Code Ann. § 78B-6-124(3) (2008) ("The consent or relinquishment of any[one other than a birth mother or adoptee] . . . may be signed before a Notary Public . . . ."). Father has not adequately contested the Relinquishment's validity on public policy grounds, and we therefore do not consider whether it was void at its inception.

Code Ann. § 78B-6-126 (2008). The statute's plain terms do not distinguish between relinquishment by an unmarried father or relinquishment by a married father. Although section 78B-6-102(6) states that "[i]n enacting this chapter, the Legislature . . . prescribed the conditions for determining whether an unmarried biological father's action is sufficiently prompt and substantial to require constitutional protection," this language does not state that the Adoption Act was intended to apply only to unmarried fathers.[5] *See id.* § 78B-6-102(6)(a). Indeed, as the trial court correctly noted, several provisions of the Adoption Act expressly distinguish between the rights of married and unmarried fathers. *Compare id.* § 78B-6-110(2)(h) (providing that notice must be given to "any person who is married to the child's mother at the time she executes her consent to the adoption or relinquishes the child for adoption"), *with id.* § 78B-6-110(3) (providing conditions that an unmarried biological father must satisfy in order to be entitled to notice of an adoption proceeding); *compare also id.* § 78B-6-120 (noting that "both parents" must consent to an adoption or relinquishment for adoption of a child who was "conceived or born within a marriage"), *with id.* § 78B-6-121 (noting that adoption does not require the consent of an unmarried biological father unless certain enumerated criteria are satisfied). By distinguishing between the rights of married and unmarried fathers in certain sections of the Adoption Act, the legislature has indicated that the act generally applies to both groups, unless otherwise provided in the statutory language.

¶17    The Relinquishment Statute is plain on its face and does not distinguish between married fathers and unmarried fathers. Therefore, we agree with the trial court that it applies to both classes of individuals. Because Father properly executed the Relinquishment, it was valid and enforceable when signed and the trial court did not err in enforcing it.[6] *Cf. In re adoption of Baby B.,* 2012 UT 8, ¶ 34, 270 P.3d 486 (holding

---

[5]Utah Code section 78B-6-103(17) defines an "unmarried biological father" as "a person who: (a) is the biological father of a child; and (b) was not married to the biological mother of the child . . . at the time of the child's: (i) conception; or (ii) birth." *See* Utah Code Ann. § 78B-6-103(17) (2008) (current version at *id.* § 78B-6-103(19) (Supp. 2011)).

[6]The Relinquishment was signed "before a Notary Public" as permitted by Utah Code section 78B-6-124(3). *See id.* § 78B-6-124(3) (listing persons who may witness a

(continued...)

that under the Relinquishment Statute, a birth mother's voluntary relinquishment of her parental rights that was executed before the court as required by statute could be enforced without further action from the court because it was "effective when it [was] signed and [could] not be revoked" (internal quotation marks omitted)).

B.  Necessity of a Best Interests Analysis

¶18     Father also argues that the trial court erred in determining that a best interests analysis was not required before Father's parental rights were terminated.  Father relies solely on the Utah Supreme Court's decision *In re E.H.*, 2006 UT 36, 137 P.3d 809, in support of that position.  However, the portions of *In re E.H.* cited by Father relate only to the trial court's responsibility to conduct a best interests analysis as part of the subsequent adoption proceeding.  *See id.* ¶ 48 (noting that a trial court has a "statutory responsibility to conduct a meaningful inquiry into whether the proposed adoption . . . [is] consistent with [the child's] best interests").  Accordingly, *In re E.H.* is not instructive regarding the question of whether a best interests inquiry must be conducted prior to the enforcement of a parent's voluntary relinquishment of his parental rights.

      1.  The Statute Does Not Require a Best Interests Analysis Under These Circumstances

¶19     Our reading of the statute is in accord with the interpretation adopted by the trial court.  Utah Code section 78B-6-112 provides that a "district court may terminate a person's parental rights in a child if:  (a) the person executes a voluntary consent to adoption, or relinquishment for adoption, of the child, in accordance with [the requirements of the Adoption Act]."  *See* Utah Code Ann. § 78B-6-112(5)(a).  Unlike the Juvenile Court Act, which provides that a juvenile court can terminate parental rights only when there is a voluntary relinquishment and relinquishment is in the best interests of the child, *see* Utah Code Ann. § 78A-6-507(1)(g), the Adoption Act does not expressly require the trial court to conduct a best interests analysis prior to enforcing a voluntary relinquishment of parental rights.  The trial court must dismiss the adoption petition and "award custody of the child in accordance with the child's best interest"

---

    [6](...continued)
consent for adoption).

only in a contested adoption where no grounds exist to terminate the parent's parental rights. *See* Utah Code Ann. § 78B-6-133(2)(b); *see also id.* § 78B-6-133(6)(b) (providing that even in the absence of consent, the trial court "may also finalize the adoption if doing so is in the best interest of the child").

¶20    Father relinquished his parental rights and consented to the adoption by signing the Relinquishment before a notary public. The statute plainly provides that the Relinquishment was effective upon execution, without further action by the court. *See In re adoption of Baby B.*, 2012 UT 8, ¶ 34. The statute does not require a best interests analysis before a relinquishment becomes effective.

> 2. Father Has Not Advanced Any Constitutional Arguments Regarding the Trial Court's Failure to Conduct a Best Interests Analysis Prior to Enforcing the Relinquishment

¶21    In its opinion reversing our prior decision and remanding this case for further consideration, the Utah Supreme Court noted that "a best interests analysis may be constitutionally required before a child's familial relationships can be terminated." *R.B.F.S. II*, 2011 UT 46, ¶ 7 n.6, 258 P.3d 583. While the United States Supreme Court has not explicitly imposed such a requirement, several justices have indicated that children may have a fundamental liberty interest in preserving family relationships. For example, in *Troxel v. Granville*, 530 U.S. 57 (2000), Justice Stevens authored a dissent stating, "[I]t seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation." *Id.* at 88-89 (Stevens, J., dissenting). Furthermore, the Utah Supreme Court has directly indicated that children have a fundamental right "to be reared by [their] natural parent[s]." *In re Castillo*, 632 P.2d 855, 856 (Utah 1981); *see also Hutchison v. Hutchison*, 649 P.2d 38, 41 (Utah 1982) (noting that a child has a "natural right to be reared, where possible, by his or her natural parent").

¶22    However, Father has neither attempted to raise the issue of the Children's constitutional rights nor argued that the failure to consider their best interests before severing the parent-child relationship renders the statute unconstitutional either facially or as applied. Consequently, we do not consider the Children's constitutional rights further. *See O'Dea v. Olea*, 2009 UT 46, ¶ 18, 217 P.3d 704 ("The presence of a constitutional issue does not excuse an appellant from complying with the preservation

rules set by this court and the Utah Rules of Appellate Procedure." (citing *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346)); *see also Troxel*, 530 U.S. at 93 n.2 (Scalia, J., dissenting) ("I note that respondent is asserting only, *on her own behalf*, a substantive due process right to direct the upbringing of her own children, and is not asserting, *on behalf of her children*, their First Amendment rights of association or free exercise. I therefore do not have occasion to consider whether, and under what circumstances, the parent could assert the latter enumerated rights.").

¶23 The Adoption Act unambiguously provides that the Relinquishment was effective when executed and could not be revoked. Father has not argued that the statute is unconstitutional, either on his own behalf or on behalf of the Children. Consequently, we conclude that the trial court did not err by enforcing the Relinquishment without first conducting a best interests analysis.

> 3. The Absence of a Statutory Requirement that the Best Interests of the Children Be Considered Before Severing an Existing Parent-Child Relationship Is Problematic

¶24 Despite the unequivocal and unambiguous nature of the Adoption Act, we consider it unlikely that the Utah Legislature contemplated circumstances such as those present here. In contrast to an unmarried father of a child not yet born, Father had a significant relationship with the Children from the time they were born or adopted into the marriage until the trial court enforced the Relinquishment. During these years, the Children bonded with Father. Although Father voluntarily relinquished his parental rights at the time of the divorce, he did so in favor of a hypothetical future spouse whose qualifications to parent the Children could not then be assessed and who might never have materialized. Furthermore, when he executed the Relinquishment, Father simultaneously agreed to continue fulfilling his role as the Children's father until Mother could locate a person willing to marry her and adopt the Children. For nearly two years after Father executed the Relinquishment, he provided financial support and exercised parent-time with the Children.[7] Thus, the bond between Father and the Children was permitted to strengthen during this time. Consequently, we share the

---

[7]Mother and Father disagree as to whether Father was in full compliance with his support obligations.

Utah Supreme Court's concerns about the Children's constitutional right to continue that parent-child relationship.

¶25 Furthermore, although Father executed the Relinquishment upon Mother's assurance that it would be used only to facilitate a stepfather adoption, according to Father's supplemental notification under rule 24(j) of the Utah Rules of Appellate Procedure and Mother's acknowledgment at oral argument, the prospective Stepfather withdrew his petition to adopt the Children after the trial court ruled that the Relinquishment effectively terminated Father's parental rights. The automatic and irrevocable nature of the Relinquishment under circumstances such as these prevents the trial court from considering significant events that occur after the execution of a Relinquishment but before adoption by a stepparent is assured. As this case illustrates, a petition for adoption filed with an action to terminate the parental rights of an existing parent might be withdrawn after the trial court exercises jurisdiction and enforces a relinquishment. *See R.B.F.S. I*, 2009 UT App 223, ¶ 12 n.10, 218 P.3d 908. The strict enforcement of a valid relinquishment under these circumstances prevents the trial court from assuring that there is an adult ready, willing, and able to parent the children before the existing parent's rights and obligations are eliminated. This is particularly troublesome where the existing parent's rights and obligations were terminated without any consideration of the best interests of the children. Where the existing parent's relinquishment is enforced before the adoption by the stepparent is assured, the children are at greater risk of becoming wards of the state.

¶26 Although the Children in this case continue to have relationships of varying degrees with Mother, it is generally preferable for children to enjoy a parental relationship with two parents bound by affection and law to nurture and support them. Where an involved and fit father's parental rights are voluntarily relinquished and no stepfather actually adopts, the children will be rendered "legal orphans" if the mother later dies or is otherwise unable to parent them.

¶27 Where there is a fit parent with a significant relationship to the Children who wishes to parent them, it may be prudent not to foreclose that possibility until another qualified and willing adult actually assumes the parental role. Indeed, the consequences to the children if they lose the one remaining parent can be horrific. A recent article in the *Virginia Journal of Social Policy and the Law* examines the devastating effects of placing children in foster care rather than permitting them to maintain a

relationship with a willing parent whose parental rights were previously terminated.[8] *See* LaShanda Taylor, *Resurrecting Parents of Legal Orphans: Un-Terminating Parental Rights*, 17 Va. J. Soc. Pol'y & L. 318 (2010). These "legal orphans" often have little chance of finding adoptive parents:

> It is difficult to determine the number of legal orphans in the United States. In 1999, one source estimated that there were between 40,000 and 80,000 children who had been freed for adoption but had not yet been adopted nationwide. Another source approximated that there were 5,970 legal orphans created in 1997 and 24,219 in 1999. The U.S. Department of Health and Human Services estimates that on September 30, 2006, there were 129,000 children waiting to be adopted.

*Id.* at 326 (footnotes omitted). Furthermore, "the absence of a legal parent has negative social, emotional, and financial effects," *id.* at 326-27, and if the children remain in foster care until they "age out" of the system at majority, they "experience dire outcomes in an array of well-being indicators, including homelessness, criminal involvement, mental and physical health, educational level, and reliance on public assistance," *id.* at 328-29 (footnotes omitted). While we do not suggest that reestablishing a relationship between an unfit parent and a child is advisable, this data may support delaying the effectiveness of a fit and involved parent's voluntary relinquishment until the trial court is assured that another qualified adult will adopt and parent them. In addition, the enforcement of the Relinquishment of a fit and involved parent simultaneously with the adoption by the stepparent seems to foster the State's compelling interest "in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of the children." *See* Utah Code Ann. § 78B-6-102(5)(a) (2008). Of course it is the exclusive role of the Utah Legislature to evaluate such policy issues. Nevertheless,

---

[8]At oral argument, counsel for Mother confirmed that two of the Children are now in foster care because Mother is unable to provide for their significant special needs. Father contends that he could provide the care needed by these Children due to his training as a nurse.

we express our concerns for that body's consideration when next it revises the Adoption Act.[9]

IV. Equitable Estoppel and Quasi-Estoppel

¶28 Finally, Father argues that the doctrines of equitable estoppel and quasi-estoppel preclude enforcement of the Relinquishment.[10] The doctrine of equitable estoppel would prevent Mother and Stepfather from enforcing the Relinquishment if Father could show

> first, "a statement, admission, act or failure to act by [Mother] inconsistent with a claim later asserted"; next, "reasonable action or inaction by [Father] taken or not taken on the basis of [Mother's] statement, admission, act, or failure to act"; and, third, "injury to [Father] that would result from allowing [Mother] to contradict or repudiate such statement, admission, act, or failure to act."

*Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 14, 158 P.3d 1088 (quoting *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 34, 989 P.2d 1077).

¶29 In the trial court, Father argued that Mother promised to place the documents in a safety deposit box and to use them only if Father attempted to obtain custody of the

---

[9]An amendment to the Adoption Act, Utah Code section 78B-6-112, was passed during the 2012 legislative session. However, this amendment does not impact the immediate effectiveness of an existing and involved parent's voluntary relinquishment of parental rights. *See* S.B. 55 Sub., 59th Leg. (Utah 2012) (enacted March 22; effective May 8, 2012).

[10]Although Father also raises waiver and laches, he fails to make any legal arguments or provide any meaningful legal analysis pertaining to these doctrines. Consequently, we decline to consider them. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 313 (Utah 1998) ("It is well established that an appellate court will decline to consider an argument that a party has failed to adequately brief."); *see also* Utah R. App. P. 24(a)(9).

Children. The trial court rejected that argument as irrelevant, indicating that Father had not alleged any inconsistent statements made or positions taken by Mother that induced Father to execute the Relinquishment in the first instance. Rather, the trial court concluded that Father's allegations indicated that Mother had consistently sought "to bar any future claim for custody by [Father,] thereby allowing her freedom to re-marry and permit a future spouse to adopt the children." Father also asserts that Mother's attempt to enforce the Stipulation in October 2005 proves that she misrepresented her intentions when she induced Father to execute the Relinquishment and the Stipulation. Relying on the record of those proceedings, however, the trial court determined that the Stipulation was "presented [to Judge Peuler] for the sole purpose of recording the [Relinquishment], but not for terminating rights at that time."

¶30    On appeal, Father does not challenge the trial court's analysis or point us to any other allegedly inconsistent statements by Mother, and we have been unable to identify any. Likewise, Mother did not seek judicial assistance in enforcing the Relinquishment until the condition Father admits he agreed to when the documents were signed occurred: Mother's subsequent husband filed a petition to adopt the Children. Consequently, we agree with the trial court that Father has not identified any inconsistent statements made or positions taken by Mother that could have induced him to sign the Relinquishment. Accordingly, Father's equitable estoppel argument fails.

¶31    For the same reason, Father cannot prevail on his argument that the doctrine of quasi-estoppel prevents enforcement of the Relinquishment.

> The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.

*Bott v. J.F. Shea Co.*, 299 F.3d 508, 512 (5th Cir. 2002) (alteration in original) (internal quotation marks omitted). Father has not alleged any position Mother took to induce him to execute the Relinquishment that she has changed to his disadvantage. Father acknowledges that he signed the Relinquishment, knowing that his parental rights would be terminated in favor of Mother's future husband, and that he agreed to

continue paying support and exercising parent-time until then. Therefore, Father has not been disadvantaged by any change in Mother's position.

CONCLUSION

¶32   We affirm the trial court's enforcement of Father's voluntary relinquishment of his parental rights. First, Judge Hilder's order did not violate the law of the case doctrine because a trial judge has the discretion to revisit a previously decided issue in the same case. Second, Father's claim that he is entitled to testify as to the Children's best interests at the adoption proceeding is not ripe. Third, the trial court did not err in failing to consider legislative history in interpreting the relevant sections of the Adoption Act because their meaning is plain. Finally, we reject Father's equitable estoppel and quasi-estoppel claims because Father has failed to identify a misrepresentation by Mother that induced him to execute the Relinquishment or an injury to Father caused by a change in her position.

¶33   Affirmed.

_____
Carolyn B. McHugh,
Presiding Judge

-----

¶34   WE CONCUR:

_____
James Z. Davis, Judge

_____
William A. Thorne Jr., Judge